**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNDER ARMOUR, INC.** | ) | |
| 1020 Hull Street | ) | |
| Baltimore, Maryland 21230, | ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | 1:19-cv-02417-ELH |
| | ) | |
| v. | ) | **REDACTED** |
| | ) | |
| **ARMORINA INC.** | ) | |
| 99 Wall Street #908 | ) | |
| New York, New York 10005 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT ON LIABILITY FOR
<u>TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION</u>**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION.................................................................................................... 1

II.   STATEMENT OF UNDISPUTED FACTS ........................................................... 2

      A.    Under Armour, Its Marks, and Its Products........................................ 2

            1.    Under Armour's Extensive Nationwide Sales and Promotion ............ 2

            2.    Under Armour's Famous UNDER ARMOUR and ARMOUR
                  Marks ................................................................................................ 4

            3.    Under Armour's Focus on Women and Women's Apparel.................. 8

      B.    Armorina and Its Wrongful Activities................................................ 10

III.  ARGUMENT ........................................................................................................ 14

      A.    The Summary Judgment Standard and Trademark Cases............................ 14

      B.    Summary Judgment Is Warranted on Under Armour's Trademark
            Infringement and Unfair Competition Claims.................................................. 15

            1.    Under Armour Owns Valid and Protectible Rights in Its
                  UNDER ARMOUR, ARMOUR, and Family of ARMOUR-
                  Formative Marks .............................................................................. 16

            2.    The Likelihood-of-Confusion Factors Favor Under Armour ............. 17

                  a.    Under Armour's Marks are Strong, Famous, and
                        Entitled to a Broad Scope of Protection.................................... 18

                  b.    The Parties' Marks Are Similar ................................................. 24

                  c.    The Parties' Goods Are Identical ............................................... 27

                  d.    The Parties' Trade Channels Are Identical and Target
                        the Same Customers .................................................................. 28

                  e.    The Parties' Advertising Is the Same and Similar.................... 29

                  f.    Armorina's Bad-Faith Intent..................................................... 30

                  g.    There Has Been No Opportunity for Actual Confusion,
                        Which Is Not Required .............................................................. 34

IV.   CONCLUSION ..................................................................................................... 35

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)......................................................................................14

*Anheuser-Busch, Inc. v. L & L Wings, Inc.*,
962 F.2d 316 (4th Cir. 1992) .......................................................................17

*B & B Hardware, Inc. v. Hargis Industries, Inc.*,
135 S. Ct. 1293 (2015)..................................................................................16

*Bridgestone Americas Tire Operations, LLC v. Federal Corp.*,
673 F.3d 1330 (Fed. Cir. 2012).....................................................................18

*CareFirst of Maryland, Inc. v. First Care, P.C.*,
434 F.3d 263 (4th Cir. 2006) .......................................................................22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)......................................................................................14

*Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*,
414 F. Supp. 1003 (E.D. Pa. 1976) ..............................................................24

*Combe Inc. v. August Wolff GmBH & Co. KG Arzneimittel*,
382 F. Supp. 3d 429 (E.D. Va. 2019), *aff'd*, No. 19-1674, 2021 WL 1384750
(4th Cir. Apr. 13, 2021) ...............................................................20, 23, 24, 34

*Communicationns Satellite Corp. v. Comcet, Inc.*,
429 F.2d 1245 (4th Cir. 1970) ..............................................................25, 34

*Dwight S. Williams Co. v. Lykens Hosiery Mills*,
233 F.2d 398 (4th Cir. 1956) .......................................................................34

*Earth Technology Corp. v. Environmentt Research of Technology, Inc.*,
No. 82-cv-6375, 1984 WL 877 (C.D. Cal. Mar. 23, 1983)...............32, 34

*Grayson O Co. v. Agadir International, LLC*,
856 F.3d 307 (4th Cir. 2017) .......................................................................22

*Gucci America, Inc. v. Action Activewear, Inc.*,
759 F. Supp. 1060 (S.D.N.Y. 1991)..............................................................35

*Hallmark Cards, Inc. v. Hallmark Dodge, Inc.*,
634 F. Supp. 990 (W.D. Mo. 1986) ..............................................................33

*International Bancorp, LLC v. Societe Des Bains*,
   329 F.3d 359 (4th Cir. 2003) ........................................................................14

*Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*,
   212 USPQ 170 (N.D. Ga. 1981), *aff'd*, 716 F.2d 833 (11th Cir. 1983)..................................31

*JFJ Toys, Inc. v. Sears Holdings Corp.*,
   237 F. Supp. 3d 311 (D. Md. 2017) ............................................................ *passim*

*John Walker & Sons, Ltd. v. Bethea*,
   305 F. Supp. 1302 (D.S.C. 1969).................................................................27

*Kenner Parker Toys Inc. v. Rose Art Industries, Inc.*,
   963 F.2d 350 (Fed. Cir. 1992).....................................................................18

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*,
   43 F.3d 922 (4th Cir. 1995) ..........................................................15, 16, 20, 25

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).................................................................................14

*People for the Ethical Treatment of Animals v. Doughney*,
   263 F.3d 359 (4th Cir. 2001) .......................................................................15

*Pizzeria Uno Corp. v. Temple*,
   747 F.2d 1522 (4th Cir. 1984) .................................................................. *passim*

*Polo Fashions, Inc. v. Craftex, Inc.*,
   816 F.2d 145 (4th Cir. 1987) .......................................................................15

*Quality Inns International, Inc. v. McDonald's Corp.*,
   695 F. Supp. 198 (D. Md. 1988).......................................................16, 17, 26

*Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*,
   227 F. App'x 239 (4th Cir. 2007) ..................................................................27

*Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*,
   405 F. Supp. 2d 680 (E.D. Va. 2005), *aff'd*, 227 F. App'x 239 (4th Cir. 2007)....................22

*Resorts of Pinehurst, Inc. v. Pinehurst National Corp.*,
   148 F.3d 417 (4th Cir. 1998) .......................................................................15

*Sara Lee Corp. v. Kayser-Roth Corp.*,
   81 F.3d 455 (4th Cir. 1996) ..................................................................... *passim*

*Seacret Spa International v. Lee*,
   No. 1:15-cv-405, 2016 WL 880367 (E.D. Va. Mar. 8, 2016)..................................25

*Sears, Roebuck and Co. v. Sears Financial Network*,
 576 F. Supp. 857 (D.D.C. 1983) ...................................................................31, 32

*Select Auto Imports Inc. v. Yates Select Auto Sales, LLC*,
 195 F. Supp. 3d 818 (E.D. Va. 2016) ......................................................................24

*Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*,
 748 F.2d 669 (Fed. Cir, 1984)................................................................................23

*Sterling Acceptance Corp. v. Tommark, Inc.*,
 227 F. Supp. 2d 454 (D. Md. 2002)........................................................................15

*Synergistic International, LLC v. Korman*,
 470 F.3d 162 (4th Cir. 2006) ....................................................................... *passim*

*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*,
 559 F. Supp. 1189 (E.D.N.Y. 1983) ...........................................................31, 32, 34

*Trek Bicycle Corp. v. Fier*,
 56 USPQ2d 1527 (TTAB 2000) ..............................................................................25

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
 505 U.S. 763 (1992).................................................................................................19

*U.S. Search, LLC v. U.S. Search.com Inc.*,
 300 F.3d 517 (4th Cir. 2002) ..................................................................................19

*V&S Vin & Sprit Aktiebolag v. Hanson*,
 61 USPQ2d 1277 (E.D. Va. 2001) ..........................................................................25

*In re Viterra Inc.*,
 671 F.3d 1358 (Fed. Cir. 2012)...............................................................................25

*Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.*,
 33 F. Supp. 2d 488 (E.D. Va. 1999), *aff'd*, 217 F.3d 843 (4th Cir. 2000)..............24

**Statutes**

15 U.S.C. § 1057(b) ........................................................................................................16

15 U.S.C. § 1114(1) .........................................................................................................15

15 U.S.C. § 1115(b) ........................................................................................................16

15 U.S.C. § 1125(a) ........................................................................................................15

**Other Authorities**

*Athliesure*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/athleisure (last visited May 7, 2021) ..................................................8

Federal Rule of Civil Procedure 56(a) ........................................................................14

*-ina*, *Dictionary.com*, https://www.dictionary.com/browse/ina (last visited May 9, 2021) ........................................................................................................................26

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:73 (5th ed. 2021) ..............................................................................................18

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:50 (5th ed. 2021) ..............................................................................................26

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:52 (5th ed. 2021) ..........................................................................................27, 33

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:106 (5th ed. 2021) ............................................................................................31

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:113 (5th ed. 2021) ............................................................................................31

I.     INTRODUCTION

Since its founder started the company two decades ago in his grandmother's basement,
Under Armour has grown from a one-person, one-product company to a multi-billion dollar
industry leader.  Under Armour toiled hard to earn its success and reputation, beating the odds to
become a household name alongside industry peers Nike, adidas, and Lululemon.  Under
Armour has done so in large part through its personality and branding, which have captivated the
attention of consumers nationwide and inspired a widespread and loyal following and fan base.

But with success comes imitators.  Copycats have tried to find a shortcut to kickstart their
business by trading off of the hard-earned goodwill associated with Under Armour's UNDER
ARMOUR and ARMOUR marks.  That's precisely what happened here when Armorina selected
the ARMORINA mark, in the following font, for its athleisure apparel and fitness bands:



As a newcomer in the field, Armorina had a vast universe of alternative marks at its
disposal, and a duty to avoid encroaching on Under Armour's iconic and widely recognized
UNDER ARMOUR and ARMOUR branding.  Yet it chose a mark that appropriates the core of
Under Armour's identity—ARMOUR—for identical products, merely removing the "U" and
adding the generic feminine suffix -INA, mirroring the structure of multiple members of Under
Armour's family of ARMOUR marks (*e.g.*, ARMOURLASTIC, ARMOURGRIP,
ARMOURFIT, ARMOURVENT, ARMOURLOFT).  Making matters worse, Armorina also
copied Under Armour's font style, rejecting 11 alternatives suggested by a designer.

1

While currently hindered by poor ( **REDACTED** ) sales, Armorina aspires to sell its apparel in the same stores (*e.g.*, *Dick's Sporting Goods*, *Bloomingdale's*) and advertise in the same media (*e.g.*, *Vogue* magazine) as Under Armour.  If Armorina is permitted to persist, grow, and further encroach on Under Armour's goodwill, consumer confusion and harm to the famous UNDER ARMOUR mark—and the many other ARMOUR marks central to Under Armour's branding and identity—is not only likely, but inevitable.

Simply put, the undisputed facts regarding the strength of Under Armour's marks and the similarity of the parties' marks, goods, customers, trade channels, and advertising compel summary judgment in Under Armour's favor.[1]

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     Under Armour, Its Marks, and Its Products

Founded in 1996 by former University of Maryland football player Kevin Plank, Under Armour has gone from a one-person operation selling moisture-wicking T-shirts designed for football players and other athletes to an internationally renowned sports and apparel company serving men and women alike.  (Declaration of Teresa Oles, May 14, 2021 ("Oles Decl."), ¶ 2.)

#### 1.     Under Armour's Extensive Nationwide Sales and Promotion

Since its inception, Under Armour has sold billions of dollars worth of products—with U.S. sales exceeding $3.2 billion in 2015, $3.8 billion in 2016, $3.6 billion in 2017, $3.5 billion in 2018, and $3.4 billion in 2019.  (*Id.* at ¶ 3.)  Under Armour's products are offered, sold, and promoted nationwide through a wide variety of retail means, including Under Armour's own stores (one of which is located in the Westfield Mall at the World Trade Center in New York

---

[1] If the Court grants summary judgment on Under Armour's infringement and unfair competition claims, Counts 1-2 and 4-5, which would in turn warrant an injunction, Under Armour will drop its remaining claims, as there would be no need to pursue them.

City, near Armorina) and thousands of national, regional, independent, boutique, and specialty retailers, such as *Academy Sports & Outdoors*, *Bass Pro Shop*, *Bloomingdale's*, *Cabela's*, *Dick's Sporting Goods*, *Dunham's*, *Foot Locker*, *Finish Line*, *Hibbett Sports*, *Kohl's*, *Macy's*, *Modell's*, *Nordstrom* (and *Nordstrom Rack*), and *REI* (among others), various hotel stores, and gyms across the country.  (*Id.* at ¶ 4.)  Under Armour's products are also sold online through Under Armour's website and third-party websites, like Amazon.com.  (*Id.* at ¶ 5.)  Under Armour further offers, promotes, and sells its products through its affiliate marketing program, where individuals sign up to become Under Armour "affiliates" and receive a commission for each Under Armour product purchased online from a unique link assigned to each affiliate.  (*Id.* at ¶ 6.)

Athletes and role models have always been central to Under Armour's brand identity and marketing.  (*Id.* at ¶ 7.)  For example, Under Armour has promoted its brand through U.S. Olympic gold medalist skier Lindsey Vonn, U.S. Olympic gold medalist track star Natasha Hastings, world-renowned ballerina Misty Copeland, super model Gisele Bündchen, U.S. Open tennis champion Sloane Stephens, and others.  (*Id.*)  Under Armour has also long-sponsored the U.S. women's gymnastics team, including during its gold medal victory at the 2016 Summer Olympics.  (*Id.*)  Hundreds of other athletes have also endorsed Under Armour, including Tom Brady, Steph Curry, Michael Phelps, and Dwayne "The Rock" Johnson.  (*Id.*)

From 2015 to 2019 alone, Under Armour invested over **REDACTED** to advertise, market, and promote its trademarks and products.  (*Id.* at ¶ 8.)  Under Armour has done so through virtually every type of digital, broadcast, and print media, including social-media websites (*e.g.*, *Facebook*, *Twitter*, *Instagram*, *YouTube*, and *TikTok*), television commercials (including ones aired during the NFL Super Bowl), streaming services (*e.g.*, *Hulu*), print publications (*e.g.*, *People*, *Women's Health*, *Shape*, *Glamour*, and *Vogue*), billboards and other signage (*e.g.*, in

Times Square, New York's SoHo neighborhood, and throughout New York City; Wrigley Field; Fenway Park; Camden Yards), popular movies (*e.g.*, *The Dark Knight Rises*, *Captain America: The Winter Soldier*, and *The Blind Side*), national television programs (*e.g.*, *Friday Night Lights*, *House of Cards*, and *Gilmore Girls*), video games, and other media.  (*Id.* at ¶ 9.)  Under Armour has also attended numerous trade shows over the years, including various fashion shows as part of Fashion Week in New York City in or around 2015.  (*Id.*)  Additionally, Under Armour's marks and products have received and continue to receive substantial unsolicited media coverage and recognition, as well as leading industry and advertising awards.  (*Id.* at ¶¶ 10-11.)  Under Armour's products also advertise themselves and serve as moving billboards.  Day in and day out, its products and branding can be seen virtually everywhere, from sidewalks and streets to parks, stores, gyms, schools, buses, trains, restaurants, offices, television, etc.  (*Id.* at ¶ 10.)

> ### 2.     Under Armour's Famous UNDER ARMOUR and ARMOUR Marks

Under Armour has used and promoted its UNDER ARMOUR mark in connection with apparel since at least 1996 and owns numerous U.S. federal registrations for its mark, several of which are incontestable (Reg. Nos. 2279668, 2509632, 2917039, 2954369, 3178549, 3375771, 3500322, 3638277, 3642614, 3700135, 3712052, 3722377, 3901624, 4135826, and 4225998).  (*Id.* at ¶¶ 12-14.)  Armorina's former counsel Jeremy Peter Green admits that UNDER ARMOUR is "famous," and Armorina's founder Juliet Huang admits that Under Armour is a "major clothing brand."  (Declaration of Patrick J. Rodgers, May 14, 2021 ("Rodgers Decl."), Ex. 3 at 170:1-4; Ex. 5 at 158:2-4.)

In addition to its UNDER ARMOUR mark, Under Armour owns the mark ARMOUR (including for apparel), which it has extensively used for over two decades.  (Oles Decl., ¶¶ 16-

17.)  Under Armour owns multiple federal registrations for its ARMOUR mark, four of which are incontestable (Reg. Nos. 3392904, 3720012, 3970978, and 4133248).  (*Id.* at ¶¶ 18-19.)

Further, for over a decade, Under Armour has also used a family of nearly 50 different ARMOUR-formative marks (*i.e.*, ARMOUR with another term or suffix) covering a wide range of apparel and other products and services, including ARMOUR BRA, ARMOURBITE, ARMOURBLOCK, ARMOURBOUND, ARMOURFIT, ARMOURFORM, ARMOURFUSE, ARMOURFUSION, ARMOURGRID, ARMOURGRIP, ARMOURGUIDE, ARMOURLASTIC, ARMOURLOFT, ARMOURSTEALTH, ARMOURSTORM, ARMOURSIGHT, ARMOURVENT, ARMOURZONE, ARMOUR FLEECE, ARMOUR GRABTACK, ARMOUR ONE, ARMOUR REACTACK, ARMOUR SELECT, ARMOUR STRETCH, ARMOUR ELITE, ARMOURBOX, ARMOUR39, GAMEDAY ARMOUR, OFFSHORE ARMOUR, BABY ARMOUR, SUN ARMOUR, and MY ARMOUR, among others.  (*Id.* at ¶ 20.)  Multiple members of Under Armour's ARMOUR family are federally registered, including incontestable Reg. Nos. 3510702 (ARMOUR FLEECE), 3861988 (ARMOURSIGHT), and 4142942 (ARMOUR BRA).  (*Id.* at ¶¶ 21-22.)

Like its extensive product lines and cutting-edge technologies, Under Armour's family of ARMOUR-formative marks is dynamic.  As older styles and technologies are retired, new products and technologies (and new ARMOUR marks) emerge.  But one thing remains constant—the term ARMOUR.  (*Id.* at ¶ 20.)

Under Armour has used its UNDER ARMOUR, ARMOUR, and family of ARMOUR-formative marks individually and/or together, so that consumers associate the ARMOUR portion of the marks with Under Armour.  (*Id.* at ¶ 23.)  Under Armour has used these marks in many

different ways and in many different places, including in product names, on products and product packaging, in stores around the country, and as the core of advertising campaigns, *e.g.*:











(*Id.*)

6

In fact, Under Armour has run extensive, nationwide advertising campaigns that reinforce ARMOUR as a potent shorthand for Under Armour and its expansive product offerings, for example, THIS IS YOUR ARMOUR, EARN YOUR ARMOUR, ARMOUR UP, YOUR ARMOUR JUST GOT LIGHTER, and, most recently, UNDER THE ARMOUR:









(*Id.* at ¶ 24.)

### 3.      Under Armour's Focus on Women and Women's Apparel

Under Armour has offered women's leggings and sports bras for over two decades under its UNDER ARMOUR and ARMOUR marks, among a full suite of apparel, including shirts, shorts, pants, leggings, sports bras, outerwear (*e.g.*, jackets), footwear, hair wraps, and more.  (*Id.* at ¶¶ 25, 29.)  Many of these products fall in the category of "athleisure," *i.e.*, "casual clothing to be worn both for exercising and for general use."  *Athliesure*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/athleisure (last visited May 7, 2021).  To that end, Under Armour focuses on performance and style, often working with top fashion designers, in and outside the company, to create its products.  (Oles Decl. ¶ 26.)

Approximately ^REDACTED of Under Armour's total U.S. revenue over the past three years comes from Under Armour's women's products, with over **REDACTED** sold from January to November 2020, **REDACTED** sold in 2019, and **REDACTED** sold in 2018.  (*Id.* at ¶ 27.)  One of Under Armour's flagship products is its ARMOUR BRA.  Released in 2012 and offered today in numerous styles and fits, the ARMOUR BRA has been Under Armour's most popular and best-selling bra and has received significant unsolicited media coverage.  (*Id.* at ¶ 28.)

Since Under Armour first offered women's apparel in 2000, it has continuously expanded and emphasized its focus on women.  (*Id.* at ¶ 30.)  For example, in 2005, Under Armour ran its

first women's commercial, featuring Heather Mitts of the U.S. national soccer team, and signed

world champion skier Lindsey Vonn to an endorsement deal the following year.  (*Id.*)  Vonn

remains one of Under Armour's pre-eminent endorsers.  (*Id.*)

Vonn, along with other female endorsers, such as Sloane Stephens, Misty Copeland, and

Gisele Bündchen, were featured in Under Armour's groundbreaking and inspiring "I Will What I

Want" campaign, which aired nationwide in numerous media (*e.g.*, online, television, print, and

billboards, including in New York City, shown below) in 2014.  (*Id.* at ¶ 31.)



(*Id.*)  The "I Will What I Want" campaign was created to celebrate women who defy expectation

and ignore the noise of outside judgments.  (*Id.* at ¶ 32.)  The campaign was highly successful,

receiving over 5 billion media impressions, resulting in a 42% traffic increase to Under

Armour's website and a 28% boost in sales, and earning Under Armour the coveted "Marketer of

the Year" award from *AdAge* in 2014.  (*Id.*)

Under Armour has run numerous other ad campaigns dedicated to inspiring, empowering,

and motivating women.  For example, from 2003-2012, Under Armour promoted its "Power in

Pink" campaign to educate female athletes about the importance of physical activity in battling

breast cancer.  (*Id.* at ¶ 33.)  The campaign featured special pink ribbon-imprinted Under Armour

9

products and donated a percentage of the proceeds to support the fight against breast cancer.
(*Id.*)  In 2007, Under Armour was awarded a *Billie Award* from the Women's Sports Foundation
for its "BoomBoom Tap" campaign targeting female team athletes.  (*Id.* at ¶ 11.)  Under Armour
ran another uplifting female advertising campaign in 2017 called "Unlike Any," featuring several
of its spokeswomen (*e.g.*, Misty Copeland, Natasha Hastings, Harlem Run founder Alison Désir,
professional stuntwomen Jessie Graf, and Chinese taekwondo champion and actress Zoe Zhang).
(*Id.* at ¶ 34.)  The "Unlike Any" campaign was designed to celebrate and honor women who rise
above antiquated gender comparisons and achieve success.  (*Id.*)  At the time, the "Unlike Any"
campaign was Under Armour's most expansive advertising campaign, featuring more than 200
pieces of content created for its digital and social platforms.  (*Id.*)

Under Armour's female endorsers have also featured prominently in other Under Armour
advertising campaigns, including its 2018 "Will Finds a Way" campaign; the 2020 "Through
This Together" campaign, which culminated in a book called the *The Better Book*, describing the
triumphs of women during the COVID-19 crisis and promoting Under Armour's ARMOUR
BRA and other sports bras; and the ongoing UNDER THE ARMOUR campaign.  (*Id.* at ¶ 35.)
In addition to these and other advertising campaigns, Under Armour also promotes its products
to women through targeted social-media pages and sites (*e.g.*, *Instagram* [@underarmourwomen]
and *Twitter* [@UAwomen]).  (*Id.* at ¶ 36.)

### B.    Armorina and Its Wrongful Activities

Armorina sells women's athletic apparel/athleisure,[2] including leggings, shorts, sports
bras, t-shirts, jackets, and shirts under the ARMORINA mark.  (Rodgers Decl., Ex 1 at Armorina

---

[2] Like Under Armour and others, Armorina defines "athleisure" as "workout clothes that you can
wear, not just in the gym, but also everyday life."  (Rodgers Decl., Ex. 3 at 42:4-6.)

Resp. to Interrog. Nos. 1, 5; Ex. 2 at Armorina Supplemental Resp. to Interrog. No. 6; Ex. 3 at,

89:7-13.)  It also offers fitness bands for working out.  (*Id.*)  Like Under Armour's products,

Armorina's are designed to be worn in everyday life and for working out.  (*Id.* at Ex. 3 at 42:18-

43:2, 90:9-17, 92:4-96:8.)

Armorina first entered the athletic apparel/athleisure market in or around April 2018.  (*Id.*

at Ex. 2 at Armorina Supplemental Resp. to Interrog. No. 6.)   Without considering any

alternative names, Armorina adopted the name ARMORINA, despite acknowledging that "a lot

of other words" could have been used to create the same commercial impression.  (*Id.* at Ex. 3 at

118:15-120:4.)

After choosing ARMORINA, Ms. Huang hired a designer to create a font.  (*Id.* at Ex. 3 at

129:6-15, 130:19-21, 131:18-20; Ex. 4 at 36:22-37:22, 47:1-16, 48:14-50:1.)  The designer

presented her the following 11 options:

| *Original Designs* | | |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |




(*Id.* at Ex. 4 at 76:4-77:13, 79:5-13, 81:11-19, 82:22-83:6, 83:20-84:7, 85:17-86:7, 86:15-87:2, 87:18-88:4, 89:5-13, 91:4-92:21, 93:4-14, 100:6-20.)  Ms. Huang narrowed her choices to the following designs, but still did not like the font of either and insisted that they be modified:



 (*Id.* at 100:6-103:11, 170:16-172:6.)  As a result of that request, the designer presented the following options:



(*Id.* at 170:16-175:15.)  Now faced with *thirteen* different options, Ms. Huang chose the only option resembling Under Armour's font, which she uses with and without the logo (including on products and at trade shows):

 

*non-logo version*                    *logo version*

(*Id.* at 75:6-76:3, 175:13-15; Ex. 2 at Armorina Supplemental Resp. to Interrog. No. 2.)

Armorina has made meager sales of [REDACTED] since its launch in 2018.  (*Id.* at Ex. 1 at Armorina Resp. to Interrog. No. 18.)  It offers and promotes its products online through its website, via a network of individual affiliate marketers, and through a handful of independent retail stores.  (*Id.* at Armorina Resp. to Interrog. Nos. 8, 15; Ex. 3 at 240:1-8, 246:2-247:15, 267:18-269:1; Ex. 4 at 251:9-252:13.)  Armorina also previously offered some of its products on Amazon.com.  (*Id.* at Ex. 2 at Armorina Supplemental Resp. to Interrog. No. 2.)  Ms. Huang aspires and plans to grow her business and sell in large sporting goods/apparel stores, gyms, and hotels, many of which overlap with Under Armour's retailers, including *Bloomingdale's, Dick's Sporting Goods, Foot Locker, Macy's, Nordstrom*, and *REI*.  (*Id.* at Ex. 3 at 193:18-22, 251:10-254:7, 255:16-18, 256:14-19.)  She also hopes to advertise in other print publications that overlap with those used by Under Armour to promote its products, including *Vogue* magazine.  (*Id.* at 236:15-237:3.)

Under Armour first objected to Armorina on September 17, 2018, by sending a cease-and-desist letter to Armorina's counsel at the time.  (Oles Decl., ¶ 39.)  Shortly after receiving this letter, Armorina emailed the company hosting its website on October 4, 2018 and instructed it to "immediately" take down the site (which was subsequently reactivated).  (Rodgers Decl., Ex. 9.)  After Under Armour filed this litigation on August 21, 2019, Armorina put its business

13

plans on pause as a result of the case.  (*Id.* at Ex. 3 at 270:12-274:20.)  It resumed its business in November 2020 and continues to offer and promote its products to date.  (*Id.*)  **REDACTED**

## III.    ARGUMENT

### A.    The Summary Judgment Standard and Trademark Cases

Under Rule 56(a), summary judgment is appropriate where "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"  *Id.* at 327 (citing Fed. R. Civ. P. 1); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the party opposing the motion is entitled to all reasonable inferences, summary judgment is appropriate where the non-movant's evidence is merely colorable, conclusory, speculative, or not significantly probative.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Similarly, the non-movant cannot rely on the possibility that there is "some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  A dispute over irrelevant or unnecessary facts will not preclude summary judgment.  *Anderson*, 477 U.S. at 248.

Summary judgment is as appropriate in trademark cases as in any other case and should be granted or denied on the same principles.  *See, e.g.*, *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162 (4th Cir. 2006) (affirming summary judgment on plaintiff's trademark infringement claim); *Int'l Bancorp, LLC v. Societe Des Bains*, 329 F.3d 359 (4th Cir. 2003) (affirming summary judgment on trademark infringement and cybersquatting counterclaims); *Resorts of*

*Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417 (4th Cir. 1998) (affirming summary judgment on plaintiff's trademark validity and infringement claims and reversing district court's denial of injunctive relief); *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311 (D. Md. 2017) (granting summary judgment on plaintiff's federal and state trademark infringement and unfair competition claims).[3]

### B.      Summary Judgment Is Warranted on Under Armour's Trademark Infringement and Unfair Competition Claims

Section 32(1) of the Lanham Act makes unlawful the use of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" in such a way as "is likely to cause confusion or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Section 43(a) of the Lanham Act similarly protects against infringement of a trademark that has not been federally registered. 15 U.S.C. § 1125(a). The test for trademark infringement under Sections 43(a) and 32(1) are the same, as is the test for Under Armour's claim for trademark infringement and unfair competition under common law and Maryland law. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 n.10 (4th Cir. 1995); *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 460 (D. Md. 2002) (citing *Pinehurst*, 148 F.3d at 422).

To establish infringement and unfair competition, Under Armour must show: (1) ownership of a valid, protectible trademark; and (2) a likelihood of confusion caused by Armorina's use of the ARMORINA mark. *Lone Star*, 43 F.3d at 930. As shown below, the uncontested facts establish both elements.

---

[3] *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir. 2001) (affirming summary judgment on plaintiff's infringement claim); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922 (4th Cir. 1995) (same); *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145 (4th Cir. 1987) (same).

1.     **Under Armour Owns Valid and Protectible Rights in Its UNDER ARMOUR, ARMOUR, and Family of ARMOUR-Formative Marks**

Under Armour's registrations for its UNDER ARMOUR, ARMOUR, and family of ARMOUR-formative[4] marks constitute "prima facie evidence of the validity of the registered mark[s] and of the registration of the mark[s], [and] of [Under Armour's] ownership of the mark[s]." 15 U.S.C. § 1057(b).  Further, many of Under Armour's registrations are incontestable,[5] entitling Under Armour to "substantial protection" and providing "conclusive evidence of [Under Armour's] rights to use th[ose] mark[s] in commerce as established in 15 U.S.C. § 1115(b)."  *Lone Star*, 43 F.3d at 930, 935 ("Incontestability is 'conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce.'") (citations omitted).

Additionally, Under Armour has developed "common law" rights in its UNDER ARMOUR, ARMOUR, and family of ARMOUR-formative marks through substantial use and promotion over the years.  *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1299 (2015) ("One who first uses a distinct mark in commerce thus acquires rights to that mark.  Those rights include preventing other from using the mark.") (citations omitted); *Quality Inns*

---

[4] A family of marks is created when a party uses a set of marks with a common element individually and together in such a way as to create "a synergistic recognition that is greater than the sum of each mark."  *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 212 (D. Md. 1988).

[5] A mark is incontestable if "after five years of continuous and unchallenged use, [] such use has been averred to in an affidavit filed with the Patent and Trademark Office within one year after the five-year period."  *Lone Star*, 43 F.3d at 930 (citing 15 U.S.C. § 1065).  Under Armour's incontestable federal registrations include Reg. Nos. 2279668, 2509632, 2917039, 2954369, 3178549, 3375771, 3500322, 3638277, 3642614, 3700135, 3712052, 3722377, 3901624, 4135826, and 4225998 (UNDER ARMOUR); Reg. Nos. 3392904, 3720012, 3970978, and 4133248 (ARMOUR); Reg. No. 3510702 (ARMOUR FLEECE); Reg. No. 3861988 (ARMOURSIGHT); and Reg. No. 4142942 (ARMOUR BRA).

*Int'l.*, 695 F. Supp. at 211-12, 220-21 (recognizing McDonald's "family of [Mc-] marks that is enforceable against infringing uses" and finding McSleep infringed that family of marks).

**2.    The Likelihood-of-Confusion Factors Favor Under Armour**

To determine whether a likelihood of confusion exists, Courts in the Fourth Circuit consider the following nine factors:

1. The strength or distinctiveness of plaintiff's mark;
2. The similarity of the two marks;
3. The similarity of the goods the marks identify;
4. The similarity of the facilities the parties use in their businesses;
5. The similarity of the advertising the two parties use;
6. The defendant's intent;
7. Actual confusion;
8. The quality of the defendant's product; and
9. The sophistication of the consuming public.

*Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (stating factors 1-7); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996) (adding factors 8 and 9).

Not all factors carry equal relevance, nor do all factors apply in each case.  *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992); *Pizzeria Uno*, 747 F.2d at 1527.  While Under Armour need not prove every element of this balancing test, as shown below, the factors decidedly favor Under Armour.  Indeed, there can be no dispute that:

- with U.S. sales exceeding $3 billion annually, UNDER ARMOUR is famous (as Armorina's prior attorney admitted) and its ARMOUR marks strong and well-known;

- with ARMOUR/ARMOR the dominant component of both parties' marks, they are similar in sight, sound, meaning, and commercial impression;

- the parties' fitness and athleisure products are identical;

- the parties' purchasers overlap;

- Armorina's current trade channels (eCommerce and affiliate marketing) and advertising overlap with Under Armour's, and Armorina hopes and intends to expand to sell in the same stores as Under Armour (*e.g.*, *Dick's Sporting Goods*, *Bloomingdale's*, etc.); and

17

- as a newcomer, Armorina had infinite alternative marks at its disposal and the legal duty to avoid conflict with Under Armour's famous UNDER ARMOUR and other ARMOUR marks, but chose to adopt an ARMOR mark for its fitness/apparel products and depict it in a font similar to Under Armour's in reckless disregard of Under Armour's prior rights.

### a. Under Armour's Marks are Strong, Famous, and Entitled to a Broad Scope of Protection

The strength of a mark is measured both by its inherent strength (*i.e.*, where it falls on the spectrum of distinctiveness) and its marketplace strength (*i.e.*, commercial recognition). *See Pizzeria Uno*, 747 F.2d at 1527, 1530-31; *Synergistic Int'l*, 470 F.3d at 173 ("The strength issue is [] properly evaluated on the basis of the mark's conceptual and commercial strength."). "[T]he stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *JFJ Toys*, 237 F. Supp. 3d at 334. *See also Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992) ("A strong mark . . . casts a long shadow which competitors must avoid.") (citation omitted); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:73 (5th ed. 2021) ("All courts agree that 'stronger' marks are given 'stronger' protection—protection over a wider range of related products and services and variations on visual and aural format.") (collecting cases). Indeed, as one court has admonished:

> There is no excuse for even approaching the well-known trademark of a competitor . . . and . . . all doubts as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous.

*Kenner Parker Toys*, 963 F.2d at 353 (quoting *Nina Ricci, S.A.R.L. v. E.T.F. Enters., Inc.*, 889 F.2d 1070, 1074 (Fed. Cir. 1989)). *See also Bridgestone Am. Tire Operations, LLC v. Fed. Corp.*, 673 F.3d 1330, 1337 (Fed. Cir. 2012) ("There is a heavy burden on the newcomer to avoid consumer confusion as to products and their source.").

18

Under Armour's UNDER ARMOUR, ARMOUR, and family of ARMOUR-formative marks are inherently and commercially strong.

### i.      Under Armour's Marks Are Inherently Strong

A mark's inherent strength (or "distinctiveness") is measured by placing it on a spectrum of distinctiveness, listed in ascending order of strength:  (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  Suggestive, arbitrary, and fanciful trademarks are inherently distinctive and "receive the greatest protection against infringement."  *Sara Lee Corp.*, 81 F.3d at 464.  A suggestive mark conjures a quality or characteristic of a product without immediately describing it, while arbitrary and fanciful marks do not suggest or describe any aspect of the goods they identify.  *Id.*  The Trademark Office's decision to register a mark, "without requiring evidence of secondary meaning, is 'powerful evidence that the registered mark is suggestive and not merely descriptive.'"  *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) (citation omitted).  A mark is descriptive if it simply and immediately "describe[s] a function, use, characteristic, size, or intended purpose of the product."  *Sara Lee Corp.*, 81 F.3d at 464.

Under Armour's UNDER ARMOUR, ARMOUR, and ARMOUR-formative marks, are at a minimum suggestive for apparel and related products.  Time and time again, the USPTO has registered *all* of these marks without requiring secondary meaning, entitling Under Armour to a "rebuttable presumption that its [] mark[s] [are] suggestive."  *Synergistic Int'l*, 470 F.3d at 172.[6]  And for those registrations that are incontestable, that presumption is even stronger, constituting

---

[6] *See also Pizzeria Uno*, 747 F.2d at 1529 ("The significance of registration without proof of secondary meaning . . . is that the Patent and Trademark Office has 'concluded' that the mark or figure was not 'merely descriptive' 'but suggestive' and this 'essential fact must be considered prima facie correct by a court in considering the validity of a trademark . . .'") (citation and internal quotations omitted).

"*conclusive* evidence of the validity of the registered mark." *Lone Star*, 43 F.3d at 930, 933-34 (emphasis added).

Armorina cannot rebut these strong presumptions. ARMOUR suggests strength, courage, fearlessness, and protection—indirectly conveying that the wearer of Under Armour's apparel can face and conquer any "battle," athletic or otherwise, in their daily lives. Under Armour's marks thus require "some imagination" to connect medieval knights in iron plates (*i.e.*, real "armour") with light, versatile clothing. *Synergistic Int'l*, 470 F.3d at 171-72. *See also Sara Lee Corp.*, 81 F.3d at 464-65 (finding L'EGGS suggestive of hosiery because it "conjures favorable images of attractive legs or legginess, and, by subtly reminding consumers of its famous egg packaging, reinforces the association between the product and its source—a sure sign of a mark entitled to protection"); *JFJ Toys*, 237 F. Supp. 3d at 330-34 (finding STOMP ROCKET suggestive for plastic, winged rockets launched by stepping on an air bladder on summary judgment; holding that "significant weight must be attached to [the] registration" where STOMP ROCKET was deemed suggestive); *Combe Inc. v. August Wolff GmbH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 447 (E.D. Va. 2019), *aff'd*, No. 19-1674, 2021 WL 1384750 (4th Cir. Apr. 13, 2021) (finding VAGISIL suggestive because "the PTO has issued plaintiff numerous registrations for the VAGISIL mark without requiring proof of secondary meaning" and because "'Vagisil' merely 'connotes' the vaginal area of a woman's body" and "a consumer must exercise some degree of 'imagination to connect it with the goods,' namely, feminine care and hygiene products") (citations omitted) .

Armorina claims that ARMOR is descriptive for "protective athletic gear." (*See* Dkt. 7 at 7.) That is incorrect and irrelevant. The focus here must be on the parties' products, namely athleisure and exercise bands. None contain metal plates or anything else that would be deemed

"armor" capable of protecting one from being shot or other physical wounds inflicted by weapons or explosives (which is also the case for protective athletic gear).[7]  Not surprisingly, there is no evidence that consumers perceive or understand ARMOUR as descriptive of protective athletic gear.  *See JFJ Toys*, 237 F. Supp. 3d at 334-35 (stating "commercial strength inquiry . . . looks at the marketplace and asks if in fact a substantial number of present or prospective customers *understand*" the designation as descriptive) (emphasis added) (citation omitted).  To the contrary, Armorina's founder and original attorney both conceded they have never heard of anyone referring to protective athletic gear as "armor."[8]

The Fourth Circuit's decision in *Synergistic International* is instructive.  There, the court affirmed the district court's summary judgment finding that GLASS DOCTOR was suggestive for windshield repair services.  470 F.3d at 172.  The district court found that DOCTOR "suggests the characteristics or quality of healing, from which a consumer must imagine that 'healing glass' means repairing or replacing."  *Id.* (citation and quotations omitted).  The defendant argued that "the court erred because [DOCTOR] is only a descriptive [word], in light of the accepted dictionary definition of 'doctor,'" which defendant asserted meant "to restore to good condition" or "to repair," and in the context of windshield repair services, the mark stands for "repairing glass or windshields."  *Id.* (quotations omitted).  The Fourth Circuit disagreed and affirmed that GLASS DOCTOR was suggestive for two reasons.  First, the USPTO did not require proof of secondary meaning when registering GLASS DOCTOR, thus entitling plaintiff "to the rebuttable presumption that its 'GLASS DOCTOR' mark is suggestive."  *Id.* (citation omitted).  Second, the public was "more likely to view the word 'doctor' to mean 'healing,'"

---

[7] *See* Rodgers Decl., Ex. 3 at 59:1-3, 59:13-60:2.
[8] Rodgers Decl., Ex. 3 at 58:3-59:3, 59:13-60:2; Ex. 5 at 187:20-188:1.

rather than "repair," and "some imagination [was] necessary in order to deduce that 'healing' applie[d] to the repair or installation of glass and windshields." *Id.* As noted above, the result is no different here for Under Armour's federally registered (and in many cases incontestable) marks, which require imagination to connect ARMOUR with apparel and other products.

### ii.      Under Armour's Marks Are Commercially Strong

Building on their inherent strength, Under Armour's UNDER ARMOUR and extended family of ARMOUR-formative marks—where ARMOUR sits at the core—have acquired substantial commercial strength. The commercial strength inquiry "looks at the marketplace and asks if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006) (quotations omitted). In the Fourth Circuit, commercial strength is evaluated by considering the same factors used to determine whether "secondary meaning" exists, namely "(1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Grayson O Co. v. Agadir Int'l, LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (citing *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990)). "Of [the] two [strength] considerations, the second [marketplace strength] is more important . . . ." *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 690 (E.D. Va. 2005), *aff'd*, 227 F. App'x 239 (4th Cir. 2007) (citation omitted).

Applying these factors here, the undisputed facts show that Under Armour's UNDER ARMOUR and ARMOUR marks are commercially strong. From 2015 to 2019 alone, Under Armour spent over **REDACTED** to advertise and promote its brands and has sold billions of

dollars worth of products, including *$3.4 billion* in 2019 alone (with over **REDACTED** worth of women's products).[9]  These sales figures alone exceed those that courts have found to be indicative of fame.  *JFJ Toys*, 237 F. Supp. 3d at 335 (finding plaintiff's mark had "considerable commercial strength" on summary judgment based on "over four million dollars of sales in 2013 alone"); *Combe*, 382 F. Supp. 3d at 450 (finding over $1 billion in sales and over $425 million in advertising from 1991 to 2019 "convincingly demonstrates that the VAGISIL brand is one of the most commercially successful brands for intimate-health products") (citing *Nina Ricci*, 889 F.2d at 1073) (holding that NINA RICCI was a strong mark for perfume, clothing, and accessories based on $200 million in sales over 5 years of use) and *Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 674 (Fed. Cir, 1984) (finding SPICE ISLANDS was a strong and famous mark based on forty years of use, annual sales of $25,000,000 for seasonings and $12,000,000 for teas)).

In addition to substantial sales and advertising, Under Armour has also received substantial unsolicited media attention, including millions of impressions from some of the most recognized national publications and numerous high-profile product placements in popular movies and television shows.  Not surprisingly, others have attempted to "plagiarize" Under Armour's marks, which have been addressed through Under Armour's successful enforcement program.[10]  Regarding length and exclusivity, since its founding in 1996, Under Armour has

---

[9] Oles Decl., ¶¶ 3, 8, 27.

[10] Under Armour's enforcement program has eliminated scores of unauthorized uses.  (Oles Decl. ¶ 37-38.)  Consistent with its duty to protect its important branding, Under Armour has never tolerated a use like Armorina's, which involves a company that has adopted an ARMOR mark for women's athletic apparel identical to that offered by Under Armour, in a font nearly identical to Under Armour's, and has ambitions to sell through many of the same retailers used by Under Armour and to advertise the same ways and in the same places as Under Armour.

grown to become an international sports company rivaling the likes of Nike and Lululemon, and Armorina has not presented *any* evidence of third-party *use*, let alone use sufficient to weaken Under Armour's inherently and commercially strong marks.[11]  In fact, the attorney hired by Armorina to conduct a trademark clearance search for ARMORINA admitted that Under Armour is "famous," and Armorina's founder concedes that Under Armour is a "major clothing brand."[12]

### b.   The Parties' Marks Are Similar

Trademark infringement does not require that two marks be identical, only that they be similar.  *See Washington Speakers Bureau, Inc. v. Leading Auth., Inc.*, 33 F. Supp. 2d 488, 497 (E.D. Va. 1999), *aff'd*, 217 F.3d 843 (4th Cir. 2000) ("[A]bsolute identity is not necessary for infringement; all that is necessary is enough similarity between the marks to confuse consumers.").  "Similarity of the parties' marks focuses on the 'dominant portion' of each to determine 'whether there exists a similarity in sight, sound, and meaning' that would 'result in confusion.'"  *JFJ Toys*, 237 F. Supp. 3d at 335 (quoting *George & Co. LLC v. Imagination Ent.*

---

[11] In its interrogatory responses, Armorina listed several trademark applications and registrations pulled from the USPTO database.  (Rodgers Decl., Ex. 2 at Armorina Supplemental Resp. to Interrog. No. 16.)  These applications and registrations alone (some of which are inactive or cancelled, others covered by agreements with Under Armour that restrict their use, and others distinguishable based on the marks themselves or the products they cover) do not constitute evidence of third-party use sufficient to weaken Under Armour's marks.  *See Combe*, 382 F. Supp. 3d at 452 ("[I]t is well-established that the existence of similar third-party marks alone is insufficient to demonstrate that a mark is commercially weak; the impact of third-party marks on the commercial strength of the senior mark depends wholly on the extent to which they are used and promoted by third-parties and are recognized by consumers.") (citations omitted); *Select Auto Imps. Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 833 (E.D. Va. 2016) ("Without evidence as to the extent of actual day-to-day use of [third-party] marks, the probative value of such evidence is minimal."); *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F. Supp. 1003, 1017 (E.D. Pa. 1976) ("[T]he mere introduction of these third party registrations does not prove that the marks to which they apply are actually in use in commerce.") (citation omitted). Armorina could not provide any details regarding the sales or commercial impact of these applications or registrations when pressed during deposition.  (Rodgers Decl., Ex. 3 at 306:12-310:8.)

[12] Rodgers Decl., Ex. 3 at 170:1-4; Ex. 5 at 158:2-4.

*Ltd.*, 575 F.3d 383, 396 (4th Cir. 2009)).  *See also Lone Star*, 43 F.3d at 936 ("[T]he marks need only be sufficiently similar in appearance, with greater weigh given to the dominant or salient portion of the marks.").  More emphasis should be placed on the similarities between the marks than the differences.  *See V&S Vin & Sprit Aktiebolag v. Hanson*, 61 USPQ2d 1277, 1280 (E.D. Va. 2001) ("In making such [similarity] determination, the court should focus more on the similarities than the differences.").  "Courts are particularly inclined to find similarity when there is overlap in the marks' dominant terms, even if the marks contain other dissimilar words."  *JFJ Toys*, 237 F. Supp. 3d at 336 (collecting cases).

Here, UNDER ARMOUR and ARMORINA are similar in appearance, sound, meaning, and impression.  The dominant ARMOUR and ARMOR elements of the parties' marks are virtually identical.  *See Commc'ns Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1249 (4th Cir. 1970) ("There can be no doubt about the resemblance of Comcet to Comsat.  They sound almost identical, and visual differences are slight."); *In re Viterra Inc.*, 671 F.3d 1358, 1367 (Fed. Cir. 2012) (finding XCEED and X-SEED confusingly similar because, in part, "it is hard to imagine that the two marks will not sound alike when spoken") (citation and quotations omitted); *Seacret Spa Int'l v. Lee*, No. 1:15-cv-405, 2016 WL 880367, at *4 (E.D. Va. Mar. 8, 2016) (finding SEACRET and SECRET "phonetic[ally] equivalent" and confusingly similar).  ARMORINA also incorporates Under Armour's ARMOUR mark in its entirety (differing by only one letter) with nothing more than the generic feminine suffix -INA, which is insufficient to differentiate ARMORINA from Under Armour's ARMOUR marks.  *See Sara Lee*, 81 F.3d at 465-66 (finding L'EGGS and LEG LOOKS confusingly similar); *Trek Bicycle Corp. v. Fier*, 56 USPQ2d 1527, 1530 (TTAB 2000) (finding, on a motion for summary judgment, that TREK  for bicycles and TREKNOLOGY for travel and all-purpose athletic bags are similar because "Applicant's

'TREKNOLOGY' mark embodies opposer's famous 'TREK' mark in its entirety, and adds to it the clear reference to technology," and "the obvious play on words created by combining 'TREK' and 'NOLOGY' facilitates the association between 'TREKNOLOGY' and 'TREK'"); 4 McCarthy, *supra*, § 23:50 ("If a junior user takes the entire mark of another and adds a generic, descriptive or highly suggestive term, it is generally not sufficient to avoid confusion.") (collecting cases).  Indeed, Armorina admitted in deposition that -INA is "a feminine word and name-forming element."[13]

What's more, the addition of the feminine-forming suffix -INA creates a composite mark (ARMORINA) that fits neatly into Under Armour's women's campaigns and overall family of ARMOUR marks, many of which include a descriptive suffix after ARMOUR (*e.g.*, ARMOURLASTIC, ARMOURSTORM, ARMOURLOFT, ARMOURGRIP, ARMOURBOX, ARMOURSTEALTH, ARMOURSIGHT, etc.), further exacerbating the likelihood of confusion. *See Quality Inns Int'l*, 695 F. Supp. at 211-12, 220-21 (recognizing McDonald's possessed a "family of [Mc-] marks that is enforceable against infringing uses" and finding McSleep infringed that family).

Not only are the parties' marks similar in sight and sound, they also share the same meaning.  Like Under Armour, Ms. Huang intends to convey "strength and fearlessness" through her ARMORINA mark.[14]

The similarities do not end there.  Despite having an infinite number of choices and alternatives, Armorina adopted a font strikingly similar to Under Armour's, which further

---

[13] *See* Rodgers Decl., Ex. 3 at 124:1-10.  *See also -ina*, *Dictionary.com*, https://www.dictionary.com/browse/ina (last visited May 9, 2021) (defining "-ina" as "a suffix used in the formation of nouns of various types, especially female proper names . . .").
[14] Rodgers Decl., Ex. 3 at 118:15-18.

increases the likelihood of confusion.  *See John Walker & Sons, Ltd. v. Bethea*, 305 F. Supp.

1302, 1307 (D.S.C. 1969) (finding marks presented in similar "Old English Script" contributed

to finding of likelihood of confusion); 4 McCarthy, *supra*, § 23:52 ("If defendant has used

plaintiff's word mark in the same lettering style, color, format or with a similar background

design, then the likelihood of confusion is increased.").



### c.     The Parties' Goods Are Identical

"[T]he similarity of the goods or services requires 'some degree of overlap' but need not

be identical or in direct competition with each other for this factor to be satisfied."  *JFJ Toys*,

237 F. Supp. 3d at 338 (citing *George & Co.*, 575 F.3d at 397).  "Because confusion may arise

where products are merely 'related,' the court is to consider 'whether the public is likely to

attribute the products and services to a single source.'"  *Renaissance Greeting Cards, Inc. v.

Dollar Tree Stores, Inc.*, 227 F. App'x 239, 244 (4th Cir. 2007) (citation omitted).  Here, the

parties' products are identical or, at the very least, should be considered similar.  Armorina offers

women's shorts, sports bras, t-shirts, jackets, and shirts—all of which Under Armour has offered

for well over a decade among its full suite of apparel and athleisure for women, *e.g.*:[15]

---

[15] *See* Oles Decl., ¶ 29, Ex. 7; Rodgers Decl., Ex. 10.




*Under Armour v. Armorina*                    *Under Armour v. Armorina*

**d.      The Parties' Trade Channels Are Identical and Target the Same Customers**

"[T]he likelihood of confusion may also be increased if both goods are sold in the same channels of trade." *JFJ Toys*, 237 F. Supp. 3d at 338 (citations omitted). "The relevant inquiry under this factor is whether the goods are sold to the same class of consumers in the same context." *Id.* (citations omitted). A party does not have the burden of showing that the parties' products are sold through the same specific retailers or websites, just that they are sold "generally" through the same channels. *See id.* (finding trade channels favored likelihood of confusion on summary judgment where both parties generally "sold in brick-and-mortar retail stores and specialty toy stores and on the internet through online retail stores and their own websites"; "An opposer does not have the burden to show sales of an infringing product by a specific chain of supermarkets or agents. Rather . . . an opposer must show the sale of an infringing product in supermarkets or by agents in general, i.e., in similar trade channels.") (quoting *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992)).

For years, Under Armour's products have been offered and sold through its website, Amazon, its affiliate marketing program, and myriad retailers (both brick-and-mortar and online), including the likes of *Bloomingdale's, Dick's Sporting Goods, Foot Locker, Macy's, Nordstrom*, *REI*, and many others.[16]  Like Under Armour, Armorina currently sells its ARMORINA athletic apparel online through its website and affiliate marketing program.[17]  Armorina also sold products through Amazon and in various brick-and-mortar retail stores.[18]

Indeed, even with Armorina's small marketplace presence, it has already offered ARMORINA-branded products in at least one store (the *LIU Post*) that also sells Under Armour products.[19]  And Armorina is intent on selling in many of the same big-box brick-and-mortar retail stores as Under Armour, including those listed above, as well as hotel shops, and various gyms, where people can buy and often encounter others wearing UNDER ARMOUR products.[20]

Further still, Under Armour and Armorina both target the same customers:  women interested in purchasing athleisure and fitness products.[21]

### e.   The Parties' Advertising Is the Same and Similar

Similarities in the manner of advertising the parties' products may also increase the likelihood of confusion.  *See Sara Lee*, 81 F.3d at 465-66.  This inquiry focuses on whether the parties "both employ similar media and target the same consumers" when promoting their marks and products.  *Id.* at 466.  *See also JFJ Toys*, 237 F. Supp. 3d at 339 ("In comparing advertising, courts look to the media, geographic scope, appearance, and content of the parties'

---

[16] Oles Decl., ¶¶ 4-6.
[17] Rodgers Decl., Ex. 1 at Armorina Resp. to Interrog. Nos. 8, 15; Ex. 4 at 251:9-252:13.
[18] Rodgers Decl., Ex. 2 at Armorina Supplemental Resp. to Interrog. No. 2.
[19] Rodgers Decl., Ex. 6.
[20] Rodgers Decl., Ex. 3 at 193:18-22, 251:10-254:7, 255:16-18, 256:14-19.
[21] Rodgers Decl., Ex. 3 at 64:16-22, 228:19-229:18.

advertisements.").

Both parties advertise and promote their products through their websites, social media (including *Facebook* and *Instagram*), print publications, affiliate marketers, and at trade shows.[22] They have also advertised in print media, including magazines, and Armorina would like to advertise in the very same magazines as Under Armour, including *Vogue*[23] and others.[24]  Further, underscoring the overlap in the parties' advertising, several of the few affiliate marketers who either promote or asked to promote Armorina's products have posted images on their personal *Instagram* and *Facebook* pages of them wearing Under Armour products.[25]

Beyond similarity in the parties' advertising *media*, the parties' advertising *messages* also overlap.  Under Armour has long sought to celebrate and empower women through its marketing, including its award-winning "I Will What I Want" campaign, "Unlike Any" campaign, and many others.[26]  Similarly, Armorina's "Mission" is "to inspire, motivate and empower [women] to be the best" they can be (which of course would be permissible under a non-infringing name and mark).[27]

### f.     Armorina's Bad-Faith Intent

Under Armour need not establish bad-faith intent on Armorina's part to prove infringement.  *See Pizzeria Uno*, 747 F.2d at 1535 ("[I]f there is good faith belief that a subsequently-adopted mark will not lead to confusion, however, that intent is no defense if a

---

[22] Oles Decl., ¶ 9; Rodgers Decl., Ex. 1 at Armorina Resp. to Interrog. No. 14; Ex. 3 at 267:20-269:1, 278:3-281:2.
[23] Oles Decl., ¶ 9; Rodgers Decl., Ex. 3 at 236:15-237:3.
[24] Armorina hired a consultant firm, through which it tried to promote its products in several other print publications Under Armour has used to promote its products, including *Shape*, *Teen Vogue*, and *Women's Health*, (Rodgers Decl., Ex. 3 at 259:16-261:13.)
[25] Rodgers Decl., Ex. 7.
[26] Oles Decl., ¶¶ 30-35.
[27] Rodgers Decl., Ex. 3 at Deposition Ex. 5; Rodgers Decl., Ex. 4 at 63:3-15, 290:19-291:2.

court finds actual or likelihood of confusion."); *JFJ Toys*, 237 F. Supp. 3d at 339 ("Although intentionality is not a necessary prerequisite to a finding of trademark infringement, it can be powerful evidence cutting in favor of [p]laintiff."); 4 McCarthy, *supra*, § 23:106 ("Proof of an intent to confuse is merely evidence relevant to whether confusion is likely.  The good faith intentions of an infringer are no defense to a finding of liability.") (citations omitted).

"Since direct evidence of intent is almost never available, circumstantial evidence is usually the evidentiary basis for proving fraudulent intent of the defendant."  4 McCarthy, *supra*, § 23:113 (citations omitted).  And "[s]ince improper motive is rarely, if ever admitted . . . the court can only infer bad intent from the facts and circumstances in evidence." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 212 USPQ 170, 176 (N.D. Ga. 1981), *aff'd*, 716 F.2d 833 (11th Cir. 1983).  For instance, in *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1198-99 (E.D.N.Y. 1983), the court inferred bad faith intent in adopting and using the KIDS "R" US mark despite defendant's contention that it had no knowledge of TOYS "R" US.  The court found that defendant's purported lack of knowledge was incredible and "so vague and evasive as to give rise to the inference that he was attempting to conceal the fact he adopted his mark with knowledge of the plaintiff's mark," particularly where a TOYS "R" US store had been open for two years at a location two miles away from where defendant opened its competing store. *Id.*  In *Sears, Roebuck and Co. v. Sears Financial Network*, 576 F. Supp. 857, 863 (D.D.C. 1983), the court similarly "ha[d] difficulty in accepting defendants' version of the origination of his corporate name," namely, that he had no knowledge of plaintiff Sears, Roebuck and Co. and its SEARS mark, "[i]n view of the fact that plaintiff has been doing business and advertising under the Sears Financial name [the same name as defendant] and upon considering the related services offered by the parties."  As a result, the court found it could be "inferred that the defendant's

31

intent was to trade off the plaintiff's well-known name and mark SEARS." *Id.* And in *Earth Technology Corp. v. Environment Research of Technology, Inc.*, No. 82-cv-6375, 1984 WL 877, at *4 (C.D. Cal. Mar. 23, 1983), the court found at the preliminary injunction stage that the junior user's claim that it never heard of the senior user's mark before choosing its name "difficult to believe" and "not credible" because the parties were direct competitors and such a denial supported "an inference of wrongful intent."

Like in *Toys "R" Us*, *Sears*, and *Earth Technology*, the circumstantial evidence here permits an inference of bad-faith intent. Long before Armorina adopted its name, Under Armour extensively promoted its mark through billions of dollars worth of advertising around the country in virtually every media available, including online, print, trade shows, and high-profile signage.[28] Under Armour and its products have been featured on the most prominent stages possible, including at the *Olympics*, in the *Super Bowl*, and in countless popular movies and television shows, to name a few.[29] And Under Armour has sold billions of dollars worth of products, including over $3 billion in 2019, and people everywhere (including celebrities) are often seen in apparel bearing Under Armour's iconic marks, including at the *Lucille Roberts* gym, where Armorina's founder Ms. Huang admittedly has worked out since at least 2014.[30] Further in New York, where Ms. Huang has lived and worked since at least the early 2000s and where Armorina is located,[31] Under Armour and its marks have prominently featured on billboards in Times Square;[32] on advertisements throughout the city, including in the SoHo

---

[28] Oles Decl., ¶ 9.
[29] Oles Decl., ¶¶ 7, 9.
[30] Oles Decl., ¶¶ 3, 10; Rodgers Decl., Ex. 3 at 156:5-157:1; Ex. 8.
[31] Rodgers Decl., Ex. 3 at 15:9-16:9, 18:3-5, 22:17-24:6, 26:14-21, 27:13-14, 28:15-17, 29:2-6, 30:13-31:7, 36:9-37:13, 85:13-15. *See also* Dkt. 1 at ¶ 4; Dkt. 7 at ¶ 4.
[32] Armorina's founder also admitted that "a lot of people [] got to Times Square and World Trade Center" because "there's a lot of shops." (Rodgers Decl., Ex. 3 at 84:3-7.)

neighborhood (where Under Armour previously operated its own store);[33] and at Under Armour's store located at the Westfield Mall at the World Trade Center.[34]  Armorina itself admitted Under Armour is a "major clothing brand" and Armorina's original attorney conceded that Under Armour is "famous."[35]

Despite all of this, Ms. Huang claims that she "d[idn't] know Under Armour" when she created Armorina in 2018.[36]  Not only is that implausible on its face, but at her insistence, the designer of the ARMORINA logo changed the font it originally proposed, resulting in a font strikingly similar to Under Armour's, which she selected.[37]  *See Hallmark Cards, Inc. v. Hallmark Dodge, Inc.*, 634 F. Supp. 990, 999 (W.D. Mo. 1986) (finding use of HALLMARK-type style and associated slogans on auto dealership supports finding of likelihood of confusion and of defendant's intent to "ride the coattails of an existing reputable company"); 4 McCarthy, *supra* § 23:52 ("A finding that a junior user uses the same type style or script as the [senior] user can be evidence of deliberate copying and intent to confuse.").



---

[33] Armorina's founder admitted that SoHo is one of two "big high-traffic shopping areas" in New York City.  (Rodgers Decl., Ex. 3 at 81:14-17.)

[34] Oles Decl., ¶ 4.

[35] Rodgers Decl., Ex. 3 at 170:1-4; Ex. 5 at 158:2-4.

[36] Rodgers Decl., Ex. 3 at 80:5-9.

[37] Rodgers Decl., Ex. 4 at 170:16-171:13.

Given this and the prominence of the Under Armour brand in New York, the United

States, and globally, and because Armorina's identical products compete directly with Under

Armour's, Armorina's incredible assertion warrants an inference that Armorina "was attempting

to conceal the fact [it] adopted [its] mark with knowledge of [Under Armour's] mark," *see Toys*

*"R" Us*, 559 F. Supp. at 1199, and "an inference of wrongful intent," *see Earth Technology*,

1984 WL 877, at *4.  Moreover, a defendant's continued use of a mark after receiving a cease-

and-desist letter further supports an inference of bad faith.  *JFJ Toys*, 237 F. Supp. 3d at 339

(citing *Field of Screams, LLC v. Olney Boys & Girls Cmty. Sports Ass'n*, No. 10-cv-0327, 2011

WL 890501, at *7 n.10 (D. Md. Mar. 14, 2011)).

Irrespective, bad-faith intent "is not a necessary prerequisite to a finding of trademark

infringement," and summary judgment for Under Armour is warranted.  *See id.*

### g.    There Has Been No Opportunity for Actual Confusion, Which Is Not Required

Actual confusion is not necessary for a finding of likelihood of confusion.  *Sara Lee*, 81

F.3d at 463 ("The test is *likelihood* of confusion; evidence of actual confusion is unnecessary.")

(citation omitted); *Pizzeria Uno*, 747 F.2d at 1527 ("In applying the test, it is not necessary for

the owner of the registered trademark to show actual confusion:  'the test is whether there is

likelihood of confusion.'") (citation omitted); *Dwight S. Williams Co. v. Lykens Hosiery Mills*,

233 F.2d 398, 401 (4th Cir. 1956) ("In determining infringement, it is not necessary to prove

actual confusion.").  This is especially true where, as here, the junior user's business has been

operating for only a short time and the products have had only limited exposure.  *See Commc'ns

Satellite*, 429 F.2d at 1251 (finding likelihood of confusion despite "slight" proof of actual

confusion "because the suit was instituted when [defendant] was in its infancy"); *Combe*, 382 F.

Supp. 3d at 461 ("[E]vidence of the number of instances of actual confusion must be placed

34

against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence.  Accordingly, because defendant has not begun to use its [] mark in United States commerce, a lack of anecdotal evidence of confusion is unsurprising and is thus not meaningful in this case.") (citations omitted); *Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1065 (S.D.N.Y. 1991) (lack of actual confusion not surprising given the "apparently small scale and short duration of defendants' operations").

Since its inception in 2018, Armorina has sold less than REDACTED worth of its products.[38] In addition, Armorina voluntarily put its sales on ice shortly after this lawsuit, only recently resuming its advertising efforts in around November 2020.[39]  As a result,      **REDACTED**

The lack of known instances of actual confusion is thus neither surprising nor probative given the limited exposure consumers have had to the ARMORINA mark.  But if not enjoined now, Armorina is set on a collision course with Under Armour that will harm its valuable brand at the expense of consumers who will assume that Armorina's use of Under Armour's branding indicates Under Armour's involvement, association, and/or approval with Armorina and its athleisure and fitness products.

## IV.  CONCLUSION

For the above reasons and authorities, Under Armour respectfully requests that its motion for summary judgment be granted.

---

[38] Rodgers Decl., Ex. 1 at Armorina Resp. to Interrog. No. 18.
[39] Rodgers Decl., Ex. 3 at 270:12-274:20.

Dated:  May 14, 2021                    Respectfully submitted,

*/s/ Douglas A. Rettew*
Douglas A. Rettew (Bar #29815)
Anna B. Naydonov (Bar #21144)
Patrick J. Rodgers (Bar #21148)
FINNEGAN, HENDERSON, FARABOW,
  GARRET & DUNNER LLP
901 New York Avenue, NW
Washington, D.C. 20001-4413
(202) 408-4000 (phone)
(202) 408-4400 (fax)
Email: doug.rettew@finnegan.com
Email: anna.naydonov@finnegan.com
Email: patrick.rodgers@finnegan.com

*Attorneys for Plaintiff Under Armour, Inc.*

36